UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SPECTRUM CUBIC, INC.,

    Plaintiff,

v.                                                   Case No. 1:11-CV-308

GRANT PRODUCTS DE MEXICO,           HON. GORDON J. QUIST
S.A. DE C.V.,

    Defendant.
_____/

**OPINION**

        Plaintiff, Spectrum Cubic, Inc. (SCI), has sued Defendant, Grant Products de Mexico, S.A. de C.V. (Grant), seeking to recover $412,568.98 from Grant. SCI alleges claims for account stated, open account, breach of contract, and unjust enrichment/quantum meruit. In response, Grant has filed a one-count Counterclaim for tortious interference with contractual and business relationships and expectancies. SCI has moved for summary judgment on its claims for account stated and open account and on Grant's counterclaim. Although the parties have requested oral argument, the Court concludes that oral argument is unnecessary.

        For the reasons set forth below, the Court will grant SCI's motion in its entirety and enter judgment in favor of SCI in the amount of $412,568.98.

**I. BACKGROUND**

        SCI is a Michigan corporation with its principal place of business in Michigan. SCI provides hydrographic film and activator for use in producing parts for various industries, including automobile steering wheels. (Bassett Aff. ¶ 5, Pl.'s Br. Supp. Mot. Summ. J. Ex. 1.) SCI also provides related services in the form of consulting, management, and engineering support. (*Id.*)

Prior to January 1, 2010, SCI provided these goods and services to Spectrum Trim, LLC, Spectrum Texas, Inc., and Premier Trim, LLC (collectively referred to as the Spectrum Group), all of which were located in Brownsville, Texas. (*Id.*)

Effective January 1, 2010, the Spectrum Group entered into a Joint Venture Agreement (JVA) with Grant, a Mexican corporation, and Grupo Empresarial Seser, S.A. de C.V. (Seser), another Mexican corporation, for the purpose of producing and selling automobile steering wheels. (*Id.*; JVA Art. II, § 2.01, Bassett Aff. Ex. A.) Grant was given exclusive control of the joint venture's business, (*id.* § 2.02), and to that end, "purchased all of the business, assets, properties, contractual rights, goodwill, going concern value, rights and claims of the Spectrum Group related to the Spectrum Group's production and/or marketing of steering wheels, in any manner whatsoever, worldwide." (Counterclaim ¶ 16.) Pursuant to the JVA, Grant agreed to assume liabilities of the Spectrum Group. (JVA Art. III, § 3.03). After the joint venture was formed, SCI continued to provide Grant the same goods and services it had provided to the Spectrum Group before the joint venture. (Bassett Aff. ¶ 6; Triick Aff. ¶ 23 & Ex. Q, Pl.'s Br. Supp. Mot. Summ. J. Ex. 2.) In addition, Grant agreed to pay SCI an annual fee of $200,000.00, or $16,666.67 per month, for management services. (Bassett Aff. ¶ 7; Trick Aff. ¶ 5 & Exs. F, I, K & l; Wilder Aff. ¶ 5, Pl.'s Br. Supp. Mot. Summ. J. ¶ 5.) These services were provided primarily by two SCI employees, Eric Martz and Rob Wilder.[1] (Triick Aff. ¶ 5 Summ. J. Ex. 2; Wilder Aff. ¶¶ 5–6.)

In all, SCI billed Grant $763,398.86 for goods and services (including $117,475.16 that Spectrum Texas owed SCI for goods or services furnished prior to the joint venture). (Triick Aff. ¶¶ 7, 9, 10.) Between July 9, 2010, and December 22, 2010, Grant made five payments to SCI

---

[1] During the term of the joint venture, Wilder served as Grant's acting Vice President of Engineering. (Segovia Aff. ¶ 6, Def.'s Br. Opp'n Ex. B.) Martz was also an employee of Grant during this time. (*Id.*)

2

totaling $350,829.88, including two payments of $5,207.44, a payment of $10,415.00, a payment of $60,000.00, and a payment of $270,000.00. (Trick Aff. ¶¶ 8, 20, 21, 23 & Exs. A, N, O & P.)

On December 15, 2010, Kevin Bassett, SCI's President, sent Grant's President, Julio Segovia, a letter advising Segovia that Grant owed SCI $682,389.56 as of November 30, 2010. (Bassett Aff. ¶ 9 & Ex. B.) The letter notified Segovia that SCI would not supply additional products or services to Grant unless Grant paid the balance due in full. (*Id.*) On December 16, 2010, Bassett sent Segovia another letter reminding him that Grant owed SCI $682,389.56 and that this amount included the management services of Eric Martz and Rob Wilder. (*Id.* ¶ 10 & Ex. C.) Segovia responded to Bassett's letters on December 17, 2010, advising that Grant would be paying SCI "270,000 dollars on Monday of next week, and during the second week of January of next year, [would] pay 250,000 dollars, with the rest on the second week of February of next year." (*Id.* ¶ 11 & Ex. D.) Grant made the initial $270,000.00 payment, (*id.* ¶¶ 12–13 & Ex. E), but failed to make any further payment.

In the fall of 2010, Grant decided to move certain production lines from its location in Brownsville, Texas, to a new facility in Matamoros, Mexico. (Counterclaim ¶ 26.) Grant could not proceed with the move without approval from its customer, Autoliv, Inc. (*Id.* ¶¶ 21, 28.) Autoliv denied approval of the transfer as of December 9, 2010, based on a number of considerations, including the lack of quality systems in place at the Matamoros facility. (Senkin Dep. at 23–24, Pl.'s Br. Supp. Mot. Summ. J. Ex. 6.)

In December 2010, Sesser exercised its call option under the JVA to purchase all of the Spectrum Group's shares of Grant. (Bassett Aff. Ex. F.) Subsequently, in January 2011, Seser served a Notice of Arbitration on the Spectrum Group pursuant to an arbitration provision in the JVA. (Bassett Aff. Ex. G.)

3

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

### A. Spectrum's Claims for Account Stated and Open Account[2]

Spectrum contends that it is entitled to recover the sum of $412,568.98 from Grant based on its theories of account stated and open account.

A claim of account stated arises from a "balance struck between the parties on a settlement; and where a plaintiff is able to show that the mutual dealings which have occurred between the parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance." *Thomasma v. Carpenter*, 175 Mich. 428, 437, 141 N.W. 559, 561 (1913). To show that charges or fees have become an account stated, a creditor must prove that the debtor either expressly accepted the charges by paying them or failed to object to them within a reasonable time. *See*

---

[2] The parties cite Michigan law in their briefs and do not contend that SCI's claims or Grant's counterclaim are governed by the law of any jurisdiction other than Michigan. Therefore, the Court will adhere to its usual practice of applying Michigan law in diversity cases. *See Rupert v. Daggett*, 695 F.3d 417, 423 (6th Cir. 2012) ("Federal courts sitting in diversity generally apply federal procedural rules and the substantive law of the forum state.")

*Keywell & Rosenfeld v. Bithell*, 254 Mich. App. 300, 331, 657 N.W.2d 759, 777 (2002) (per curiam). In contrast, an open account "'means an indebtedness subject to future adjustment, and which may be reduced or modified by proof.'" *Siciliano v. Mueller*, No. 222258, 2001 WL 1699801, at *2 (Mich. Ct. App. Dec. 28, 2001) (per curiam) (quoting Black's Law Dictionary (6th ed.) at 18.); *see also A. Krolik & Co. v. Ossowski*, 213 Mich. 1, 7, 180 N.W. 499, 501 (1920) ("An open account is one which consists of a series of transactions and is continuous or current, and not closed or stated.") (citation omitted).

> "The conversion of an open account into an account stated, is an operation by which the parties *assent* to a sum as the correct balance due from one to the other; and whether this operation has been performed or not, in any instance, must depend upon the facts. That it has taken place, may appear by evidence of an express understanding, or of words and acts, and the necessary and proper inferences from them. When accomplished, it does not necessarily exclude all inquiry into the rectitude of the account."

*Kaunitz v. Wheeler*, 344 Mich. 181, 185, 73 N.W.2d 263, 365 (1955) (italics in original) (quoting *White v. Campbell*, 25 Mich. 463, 468 (1872)). "Accounts stated may be attacked upon the ground of fraud or mistake, but the burden in such cases is upon the attacking party." *Unifund CCR Partners v. Riley*, No. 287599, 2010 WL 571829, at *3 (Mich. Ct. App. Feb. 18, 2010) (per curiam) (internal quotation marks omitted).

As support for its motion for summary judgment, SCI presents evidence that: (1) Grant agreed to assume a preexisting debt from Spectrum Texas (a member of the Spectrum Group) to SCI in the amount of $117,475.16; (2) Grant agreed to pay SCI a monthly management fee of $16,667.00; (3) Grant agreed to pay SCI a weekly fee of $1,731.00 (actually billed at $1,361.30) for Eric Martz's wages; and (4) SCI provided materials to Grant after the joint venture began. SCI's evidence that Grant agreed to assume the Spectrum Texas payable to SCI includes:

- A January 15, 2010 email from Gina Triick, SCI's Chief Financial Officer, to Bernardo Jimenez, Grant's Chief Financial Officer, attaching an accounts receivable

5

aging report for Spectrum Texas showing $117,475.16 owed to SCI as of December 31, 2009. (Triick Aff. Ex. C.)

- A March 25, 2010 email from Triick to Marco Yee, Grant's Controller, attaching an Unpaid Bills Detail for Spectrum Texas, showing $118,321.76 owing to SCI through the end of 2009.³ (*Id.* Ex. D.)

- An April 21, 2010 email from Yee to Triick attaching an Accounts Payable Aging report for Grant showing that $118,321.75 of the $273,028.18 Grant owed SCI as of April 20, 2010 was more than 90 days old. (*Id.* Ex. J.)

SCI's evidence that Grant agreed to pay SCI a monthly management fee and pay Martz's and Wilder's expenses includes:

- A December 23, 2009 email from Triick to Yee attaching a thirteen-week cash flow report including a monthly management fee of $16,667.00 and a weekly consulting fee of $1,731.00 for Martz. (*Id.* Ex. E.)

- A February 11, 2010 email from Triick to Jimenez attaching an expense report for Grant that includes the January expense for Martz's services in the amount of $6,806.44 and SCI's monthly management fee of $16,667.00. (*Id.* Ex. F.)

- An April 27, 2010 email from Triick to Yee attaching an income statement showing a monthly management fee of $16,666.86 to "Spectrum" and Martz's monthly wages of $6,806.44. (*Id.* Ex. H.)

- April 26, 2010 and May 10, 2010 emails from Triick to Yee attaching invoices from SCI to Grant for March and April, 2010, for SCI's monthly management fee of $16,666.67, $5,445.15 for Martz's weekly wages, and amounts for miscellaneous expenses. (*Id.* Exs. I and K.)

- An April 21, 2010 email from Yee to Triick, Segovia, and Wilder attaching an Accounts Payable Aging report for Grant showing that Grant owed SCI $273,028.18 as of April 21, 2010. (*Id.* Ex. J.)

- A July 7, 2010 email from Yee to Jimenez, Bassett, Triick, Segovia, and Wilder stating, "[s]tarting this week, we are paying Spectrum Cubic $5,207.44 on a weekly basis (Consulting fee's [sic] and Eric [sic] Wages to treat these concepts as Payroll),

---

³ The Court notes a discrepancy between the number Triick cites in her affidavit and the number disclosed in the Unpaid Bills Detail attached to Triick's affidavit as Exhibit D. Triick states that the detail shows $117,475.16 as owing to SCI, (Triick Aff. ¶ 9), while Exhibit D, according to the Court's math, shows $118,321.76 owing to SCI. The Court also notes that the Grant Accounts Payable Aging report attached to Triick's affidavit as Exhibit J shows that of the $273,028.18 Grant owed to SCI as of April 20, 2010, $118,321.75 was more than 90 days old, which is consistent with the amount set forth in Exhibit D.

6

> the remaining concepts should be paid according to cash availability." (*Id.* Ex. L.) On July 8, 2010, Yee emailed Triick requesting SCI's bank information so that he could "start wiring Consulting and Wages weekly" to SCI. Triick provided the bank information to Yee on July 9, 2010. (*Id.* Ex. M.) That same day, Grant wired SCI $5,207.44. (*Id.* Ex. N.)

• Copies of checks from Grant to SCI dated July 22, 2010, and July 30, 2010, in the amounts of $5,207.44 and $10,415.00, respectively. (*Id.* Ex. O.)

• An August 10, 2010 email from Yee to Bassett, Wilder, Segovia, Triick, Jimenez, and others attaching a Cash Flow Report for Grant showing a projected payment of $60,000.00 for consulting. (*Id.* Ex. Q.) On August 11, 2010, Yee confirmed to Triick a $60,000.00 wire transfer from Grant to SCI and stated, "Bernardo (Jimenez) and Julio (Segovia) have instructed me to include payments to Spectrum every two weeks for the next 9 weeks to clean up Spectrum's account." (*Id.* Ex. Q.) Yee also attached an account statement for SCI reflecting two payments of $5,207.44, a payment of $10,414.88, and a payment of $60,000.00. (*Id.*)

In addition to the foregoing evidence, SCI has shown that Segovia acknowledged Grant's debt to SCI when, in response to Bassett's demands that Grant pay its outstanding debt to SCI of $682,389.56, Segovia stated that Grant would be "paying $270,00.00 dollars on Monday of next week, and during the second week of January of next year, will pay 250,000.00 dollars, with the rest on the second week of February next year." (Bassett Aff. Ex. D.) Consistent with Segovia's commitment, Grant wired SCI $270,000.00 on December 22, 2010. (*Id.* Ex. E.) Segovia did not dispute the amount claimed, nor did he protest that SCI was not the proper payee. Thus, on behalf of Grant, Segovia expressly acknowledged both the legitimacy and accuracy of the amount Bassett claimed Grant owed SCI.

Grant offers several grounds for denying SCI's motion on its account stated claim, all of which lack merit.

Grant first argues that SCI has not met its summary judgment burden because it failed submit a copy of Schedule 3.03(a) to the JVA to show that the debt from Spectrum Texas to SCI was listed as a debt that Grant agreed to assume. The existence of Schedule 3.03(a), which may never have

7

been prepared, is irrelevant to SCI's claim because SCI's evidence shows that Grant considered itself responsible for the debt from Spectrum Texas to SCI. That is, Grant included that debt as part of Grant's debt to SCI. Given Segovia's express agreement to the amount Bassett claimed Grant owed SCI, the absence of Schedule 3.03(a) fails to undermine SCI's claim.

Grant next argues that a Side Letter dated January 29, 2010, between Grant and the Spectrum Group states that Grant is not bound by the schedules and exhibits attached to the JVA. (Jimenez Aff. Ex. 1, Def.'s Br. Opp'n Ex. B.) The Side Letter does not help Grant, as nothing in that document refers to Grant's assumption of the Spectrum Group's liabilities. In addition, as noted above, SCI's evidence refutes Grant's suggestion that it did not agree to assume the Spectrum Texas liability to SCI. Grant's next argument, that the Spectrum Texas debt to SCI was excluded from the assumed liabilities pursuant to § 3.04(e) of the JVA, fails for the same reason—namely, that SCI's evidence shows that Grant acknowledged that it was responsible for the Spectrum Texas debt.

Grant next contends that it owes nothing to SCI because the Spectrum Group, and not SCI, furnished goods and Martz's services to Grant. This argument lacks merit because the statements in the Jimenez affidavit—that SCI provided no goods or services to Grant and that Grant never received an invoice from SCI (*Id.* ¶¶ 8–10)—upon which Grant relies, are soundly refuted by SCI's evidence, which shows both that SCI sent Grant invoices and that Grant acknowledged, internally as well as to SCI's representatives, that Grant owed the debt to SCI. In fact, SCI's evidence shows that Grant paid SCI by wire transfer and check. Moreover, as SCI notes, the Spectrum Group is not an entity, but merely a reference to a collection of companies that were, more or less, absorbed by Grant as part of the joint venture.

Finally, Grant contends that pursuant to the arbitration provision in the JVA, SCI should have raised its account stated claim as part of the pending arbitration. As SCI notes, however, it is

not a party to the JVA, and the arbitration provision is expressly limited to the parties to the JVA: "The Award shall be conclusive and final for all purposes. and binding on the Parties, and may be enforced in any jurisdiction by the wining [sic] Party." (JVA Art. X, § 10.08.) More importantly, Grant has not moved to compel SCI to arbitrate. Thus, whether SCI should have been required to submit its claim to arbitration is not an issue the Court need decide.

**B.     Grant's Counterclaim**

For its counterclaim, Grant alleges that SCI intentionally, improperly, and wrongfully interfered with Grant's contractual and/or business relationships and expectancies with Autoliv. (Counterclaim ¶¶ 47–50.) In particular, Grant alleges that SCI's interference caused Autoliv to withhold its approval of the transfer of the Grant production lines from Brownsville to Matamoros.

> The elements of tortious interference with a business relationship are the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy, an intentional interference by the defendant inducing or causing a breach or termination of the relationship and resultant damage to the plaintiff. To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference. Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.

*Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 78, 661 N.W.2d 586, 597 (2003) (quoting *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 522 N.W.2d 919 (1999) (citations omitted)).

Grant's tortious interference claim fails for several reasons. First, Grant cannot show that SCI engaged in interference that caused Autoliv to withhold its consent to the proposed transfer of Grant's production lines. David Senkin, the Autoliv employee with authority to approve the transfer for Autoliv, testified that Wilder—the Spectrum representative who also represented Grant in its dealings with Autoliv—did nothing to influence Senkin's decision to withhold approval of the

transfer in December 2010. (Senkin Dep. at 18, 36–37, Pl.'s Br. Supp. Mot. Summ. J. Ex. 6.) Grant contends that SCI, through Wilder, interfered with the proposed transfer by ordering Wilder not to attend a December 17, 2010 meeting with Senkin at Autoliv's facility to discuss Grant's proposed transfer. (Def.'s Br. Opp'n at 6–7.) Grant also claims that SCI further interfered with Autoliv's decision to approve the transfer by ordering Wilder to cease communicating with Autoliv on behalf of Grant. (*Id.* at 8–9.) However, Senkin testified that he had already made the decision to withhold approval as of December 9, 2010 for several reasons, including the lack of quality systems at the Matamoros facility. (Senkin Dep. at 24.) Grant contends that Senkin's testimony is undermined by his own email, which he sent to Segovia on December 17. 2010, in which Senkin states that Grant "do[es] not have my approval to move the Hydro Line or the Vanish line" because Wilder would not be attending the meeting. (Email from Senkin to Segovia of 12/17/10, Def.'s Br. Opp'n Ex. C.) Grant fails to note, however, that the purpose of the meeting was to address quality issues related to the line transfer. (*Id.*) Grant further argues that there were no quality concerns because Autoliv had given Grant a "green" on Autoliv's quality system. Grant misrepresents the evidence on which it relies for this proposition. The evidence—an email from Wilder to Segovia dated December 14, 2010—concerned Grant's quality performance at its Brownsville facility. (Segovia Aff. Ex. 8, Def.'s Br. Opp'n Ex. B.) Because Senkin had not approved the transfer to the Matamoros facility as of December 17, the "green" rating for the month of November that Wilder mentions in his December 14 email could only have referred to Grant's Brownsville facility.[4]

Grant's tortious interference counterclaim also fails because Grant cannot show that SCI, through Wilder, took any affirmative act that interfered with the business relationship or expectancy

---

[4] Grant also argues that Autoliv's customer, General Motors, had approved the transfer, but, again, it misrepresents the evidence. The form it cites is a "Supplier Test Plan Approval Request" which merely gave approval of Grant's plan to begin testing its Matamoros facility.

10

Grant had with Autoliv. As noted above, Grant asserts that Wilder's failure to attend the December 17, 2010 meeting and his refusal to communicate with Autoliv after that date was the tortious interference. To establish tortious interference, however, a plaintiff must show that the defendant committed some act that interfered with the relationship. Wilder's failure to attend the December 17 meeting and his refusal to communicate with Autoliv were not acts, but inaction. *See Formall, Inc. v. Cmty. Nat'l Bank of Pontiac*, 166 Mich. App. 772, 779, 421 N.W.2d 289, 293 (1988) (a plaintiff alleging tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice).

Finally, Grant's tortious interference claim fails because Grant cannot show "the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Feldman v. Green*, 138 Mich. App. 360, 369, 360 N.W.2d 881, 886 (1984). As noted above, SCI instructed Wilder to refrain from providing further services to Grant because Grant owed SCI a substantial debt. SCI was well within its rights to cease providing Grant products and services because of Grant's outstanding debt. Accordingly, Grant's tortious interference claim must fail.

### IV. CONCLUSION

For the foregoing reasons, the Court will grant SCI's Motion for Summary Judgment and enter judgment in favor of SCI on SCI's account stated claim and on Grant's tortious interference counterclaim.

An Order consistent with this Opinion will be entered.


Dated: February 8, 2013  /s/ Gordon J. Quist
 GORDON J. QUIST
 UNITED STATES DISTRICT JUDGE